JEMIMA REXFORD and others *vs.* JAMES KNIGHT.

Where land is taken and appropriated by the state, for a canal, and a claim for damages is made by the owner of the land, which claim is acted upon by the appraisers, who decide that the benefits and advantages. arising from the canal are equal to the loss and damage sustained by the claimant, this adjudication has the same effect, in passing the title to the state, as an award of damages followed up by the payment thereof to the claimant.

If the benefits equal or exceed the damages, the claim is extinguished the moment it is created.

A statute allowing benefits to be set off against damages, where private property is taken for public uses, is not unconstitutional.

A map of lands, made under the direction of the canal commissioners, in pursuance of the statute , (1 *R. S.* 218, § 4, &c.) affords presumptive evidence of the actual appropriation of the premises therein described, by the state, for the purposes of the canal.

Such map alone, does not vest the title in the state. It merely describes what lands the state has taken; and is admissible in evidence for the purpose of showing the exact quantity by metes and bounds.

Like a record, it affords evidence that all the antecedent steps were taken, by the canal commissioners.

The statute which requires canal appraisers to make regular entries of their determination and appraisal, with a description of the several premises appropriated for the canals, in a book or books to be kept by the canal commissioners, and to certify and sign their names to such entries and appraisals, and to certify their determination as to the premises which will suffer no damage, or will be benefited more than injured, is merely directory.

The omission to keep such books, or to make such entries, although it may weaken the evidence by which the title of the state is proved, will not impair such title.

The title of the state rests upon the appropriation of the land, under the statutes authorizing the construction of the canals, followed by the appraisal and payment of the damages, or the adjudication by the proper board of appraisers that the benefits equal the damages.

The title which the state takes is not a mere *easement*, but an estate in fee, which vests on the payment of the damages.

Statutes in *pari materia* must be construed with reference to each other. Upon this principle it was *Held* that the state became seised of the same estate in lands taken under the act of April, 1819, for the *continuation* of the Erie canal, as it had in those appropriated by virtue of the act of April, 1817, providing for the *construction* of such canal.

THIS was an action of ejectment, to recover a portion of the Erie canal as originally constructed. The complaint alleged that the plaintiffs were seised of the premises in question,

situated in the town of Clifton Park, in the county of Saratoga, and that the defendant was in possession of the said real estate, and claimed to own and hold the same against the rights of the plaintiffs. The plaintiff, Jemima Rexford, claimed to be possessed of one undivided third part of the premises as her reasonable dower as widow of Eleazer Rexford, her late husband, and claimed to recover possession thereof, and the mesne profits of the said undivided third part for six years. And the other plaintiffs, Cyrus W. Rexford, Alonzo Rexford and Eleazer A. Rexford, each claimed an equal undivided third part of the said premises in fee, as the heirs-at-law of the said Eleazer Rexford, deceased, subject to the right of dower therein of the said Jemima Rexford, and mesne profits of the said undivided two-third parts thereof for six years. Jemima Rexford demanded judgment for the one undivided third part of the premises as her reasonable dower, and mesne profits thereon for six years, besides her costs. And Cyrus W. Rexford, Alonzo Rexford and Eleazer A. Rexford, each demanded judgment for an equal undivided third part of the premises in fee, subject to the right of dower of Jemima Rexford therein, and mesne profits for six years on two undivided third parts thereof, besides costs. The defendant, by his answer, denied that the plaintiffs were seised of, or that they owned, all or any part of the land, mentioned and described in the complaint. He admitted, however, that he was in the possession of the same, and that he claimed to own and hold the same against the plaintiffs ; and he denied that the plaintiffs had any rights in or to the said piece of land. And the defendant denied that the said Jemima Rexford was possessed or entitled to an undivided third part of said land as her reasonable dower as widow of Eleazer Rexford, her late husband, or that Cyrus W. Rexford, Alonzo Rexford and Eleazer Rexford were each entitled to an equal undivided third part of said land, as the heirs-at-law of the said Eleazer Rexford, subject to said dower. And he denied that the plaintiffs, or any or either of them, were entitled to the mesne profits of said land for the last six years, as claimed in their complaint. And the defendant

alleged that he was in the lawful possession, use and occupation of the said premises.

The cause was tried at the circuit court, held in the county of Saratoga, on the 7th day of October, 1850, before the Hon. A. C. Paige, one of the justices of the supreme court, and a jury. The plaintiffs, on the trial, called as a witness Elisha Rexford, who testified as follows : " that he resides in the town of Clifton Park, about two miles from Rexford's Flats, and knows the premises in question. They are situated at Rexford's Flats, on· the north side of the Mohawk river, at the upper aqueduct on the Erie canal. My father owned the farm which included the premises in question. He died over 30 years ago. He left five children, to wit, myself, Edward, Eleazer, Rosina and Polly ; Rosina married Ephraim Knowlton ; Polly married John Knowlton. My father left no will. Edward Rexford, my brother, is dead, and Eleazer is dead. Jemima Rexford, the plaintiff, is the widow of Eleazer Rexford, and Cyrus W., Alonzo, and Eleazer A. Rexford, plaintiffs, are the only children of my brother, Eleazer Rexford." The plaintiffs then produced a deed of release from Elisha Rexford and wife, to Eleazer Rexford, dated, June 24th, 1825, of 300 acres of land, covering the premises in question, duly executed, and also a deed of release from Edward Rexford, dated 29th June, 1824, to Eleazer Rexford, of the same premises, duly executed. Also a release executed by Ephraim Knowlton and Rosina his wife, and John B. Knowlton and Polly his wife, to Eleazer Rexford, dated 27th January, 1819, of the same premises. Alonzo J. Chadsey, a witness for the plaintiffs, testified that he was acquainted with the premises described in the above deeds, and that they covered the premises described in the complaint, and that Eleazer Rexford died in December, 1829. It was also admitted that the plaintiffs demanded the possession of the premises from the defendant before suit brought, and that the defendant was then in possession, and refused to deliver them up. It was also admitted that the plaintiff, Eleazer Rexford was now a minor, and that the plaintiffs Cyrus W. and Alonzo Rexford were minors until within the last six years. The plaintiffs then rested. The de-

fendant then called William Shepherd, as a witness, and
produced two maps, which included and covered the premises in
question; the one marked No. 1, being a map of the Erie canal as
enlarged, and the adjacent grounds, made since the Erie canal
enlargement, and showing the lands claimed by the state; the
other map, marked No. 2, being a like map of the Erie canal
as originally constructed, and showing the lands claimed by the
state. The plaintiff's counsel objected to the use of these
maps, except for the purpose of designating the locality of the
premises in question, and the adjacent premises, and to desig-
nate the lands which were claimed by the state, but objected to
their being evidence of the title or possession by the state.
The question was reserved by his honor, the justice. The
witness, William Shepherd, stated that he had examined these
maps, and that he was personally acquainted with the location
of the premises in question; that these maps were correct de-
lineations of the canal as originally constructed, and of the
new canal as at present constructed, and of the lands as claimed
by the state. The exterior blue lines on the maps represented
the lands claimed by the state, as appropriated for said canals.
The westerly blue line was on the westerly line of the towing
path of the original canal. The premises in question were
between that westerly blue line and the center of the new canal
as now used. The lot owned by the defendant adjoins this blue
line on the westerly side opposite the premises in question.
The defendant's counsel then introduced in evidence a deed
from Eleazer Rexford and Jemima his wife, Elisha Rexford
and wife, and Lucina Rexford, to Elisha Curtis, dated 26th
September, 1825, describing two parcels of land; the first de-
scribed parcel was on the easterly side of the original canal,
and was bounded on the west by the Erie canal, and was op-
posite the premises in question, containing seven acres of land;
the secondly described parcel of land was on the westerly side
of the original canal, opposite the premises in question, being
bounded in front 100 feet on the canal, by 80 feet deep; which
said deed, to Elisha Curtis, was duly acknowledged by the parties.

The witness further testified: "the premises in question lie

between the two parcels of land described in said deed. When the state made the original appropriation of lands for the original canal, the state engineer staked out the lines of the land taken. The premises in question are upon the southerly end of the old lock of the original canal. The old canal was used as marked on the map up to the blue line, until the enlarged and independent canal was completed." On cross-examination, this witness testified: "the enlarged or new canal was constructed east of the lock of the old canal. Job F. Gardiner's land, opposite the premises in question, on the east, was taken for the enlarged canal. This was a part of the first parcel of land deeded to Elisha Curtis. The defendant claims title under the Elisha Curtis deed. Knight took no title on the east side of the old canal. The bank of the new canal runs down into the bed of the old canal. The premises in question are west of the foot of the bank of the new canal. The bank of the new canal varies in height from 17 feet near the aqueduct, to about 6 or 7 feet opposite the premises in question. The distance between the foot of the bank of the new canal on the west side, and the westerly blue line of the original canal, is 60 to 70 feet." The witness also testified that since the construction of the new canal, a part of the premises had been used as a highway, and a part had been occupied by the defendant. The plaintiff proved that in the year 1822, when the Erie canal was originally constructed, Eleazer Rexford, then the owner of the premises in question, presented a claim for damages against the state, occasioned by the construction of the canal; that the board of appraisers deliberated upon such claim, and adjudged "that the benefits and advantages arising from the canal, were equal to the loss and damage the claimant had sustained."

The defendant's counsel moved the court to nonsuit the plaintiffs, on the following grounds : 1. That the premises in question belonged to the state, if they did not belong to the defendant. 2. That if the right of the state had ceased, the land reverted to the defendant, as a grantee deriving title from the Rexfords. The court granted the motion, and directed the clerk to enter an order that the plaintiffs be nonsuited, with leave to the plain-

tiffs to make a case to be carried to the general term of the supreme court. To which decision the plaintiff excepted.

*P. Potter*, for the plaintiffs. I. The case shows that the plaintiffs have the title to the premises in question, unless they have been divested of it by some act of law.

II. The defendant has shown no act or authority by which the plaintiffs have been divested of title. The maps introduced could not be evidence of any thing, except to show the localities. They lack every requisite prescribed by statute, to make them even presumptive evidence. (1 *R. S.* 218, §§ 4, 5, 6, 7.) They were received by the justice, and the question reserved. By the session laws of 1837, chap. 451, § 6, it is provided that all such maps as have heretofore been made under the aforesaid act, and such as shall hereafter be made under said act, may be presumptive evidence that the lands indicated have been *taken and appropriated* by the state. No such maps certainly were produced, and had they been, the *taking and appropriating* such lands is nowhere held to divest or confer *title*. On the contrary, it is expressly adjudicated that " the appropriation of land for a canal by the authorized agents of the state," *does · not* vest the fee in the state till the appraisement of damages. (*Baker* v. *Johnson*, 2 *Hill*, 342.) And the payment of the money was a *condition precedent* to the passing of the fee from the owner to the state. (*Brinckerhoff* v. *Wemple*, 1 *Wend.* 474, *per Savage, Ch. J. Baker* v. *Johnson*, 5 *Hill*, 347, *per Bronson, J.*) Nor is there even any evidence of *appropriation* by the state. The evidence of Wm. Shepherd is not that the state did *appropriate ;* had it been offered for that purpose, it would have been objectionable and improper. (*Jackson* v. *Daley*, 5 *Wend.* 526.) But it was to show the *time* when the state engineer *staked out the lines of the land taken*, and referring to the *time* when it was done, and as being at the *time* of the appropriation; but *the distinct fact of appropriation*, is nowhere shown or attempted to be shown; though it is attempted to be shown *where* the state located also. There is no evidence in the case that the state are in possession of the lands

Rexford v. Knight.

in question; but on the contrary all the evidence is that these lands are in possession of others.

III. The justice erred, if his decision to nonsuit the plaintiffs was based upon the proposition that the premises in question belonged to the state. (1.) The state could only obtain the title of this property in the way prescribed by statute. If they have failed to get it in that way, they have never had it. This power to take lands is found in Sess. Laws of 1819, chap. 105, p. 123, § 3, and Sess. Laws of 1817, p. 302–3, § 3. The statute of 1819 does not declare what the character of the title to be taken under its provisions shall be. But by the manner of construing statutes it excludes the idea of its being a fee, and that part of the third section of the law of 1817, not being adopted by the statute of 1819, which declares the character of the title, leaves it in this case a mere title during use. The enumeration of certain powers, in a statute, excludes all others. No implied power to take private property, against the consent of the owner, is ever given to a statute, by construction. Express terms must be given to confer such power. Section 2 of Laws of 1817 provides only for taking lands between the Seneca and Mohawk rivers. This power remained unchanged; but in 1821, (*Sess. Laws, chap.* 240, *p.* 248, § 1,) the appraisal was committed to two canal commissioners, instead of the persons to be appointed by the court. In 1825, (*Sess. Laws, chap.* 275, *p.* 398, § 1,) it was provided that the governor should nominate two reputable freeholders, who, with one acting canal commissioner, should be appraisers. In 1836, (*Sess. Laws, ch.* 287, § 1,) another change was made by giving the governor and senate power to appoint three appraisers. Through all these changes the power to take, and the necessary pre-requisite steps to acquire title, remained unchanged. It was through the officers appointed by the law of 1821, and under the power of the statutes of 1817 and 1819 that this land was attempted to be taken. From the case it appears, 1st. That the lands were attempted to be taken by an appraisal. 2d. That such attempted appraisal is fully given. 3d. That it was attempted to be exercised by the persons who then, by law, had the right to exercise the power. 4th. That

there was never any other attempt, by any means, to get the
title. 5th. The proceeding was filed in the proper, place; and
6th. That a claim for the damages was actually made by the
owner, for the land and for other damages, including damages
for the years 1822 and 1823, which claim the proper authorities
recognized and passed upon. 7th. The court will take judicial
notice that the Erie canal was completed in 1825. (2.) By this
proceeding the state did not acquire the title to the land. 1st.
There was no just and equitable *estimate and appraisal* of the
loss and damage. Whoever attempted the performance of this
duty, entirely misapprehended their duty under this branch of
the section. By *estimate* something more is meant than merely
to say one thing is equal to another, without showing that either
has any value; it means "to compute," "to calculate," "to
form an opinion or judgment of the value, extent, quantity or
degree of worth of any object." And by the word *appraise*
is meant "to set a value," "to estimate the worth of a thing."
This is the construction given to the meaning of the terms by
*Webster*. But the legislature have also given legislative con-
struction of what was intended by these terms. By Sess. Laws
of 1829, § 2, chap. 368, p. 561, found in 1 Rev. Stat. 3d ed. 254,
§ 58, they (the appraisers) "shall enter in a book to be kept for
that purpose, the nature and extent of all claims on which they
shall pass; the items on which allowances are made, and the
several amounts allowed, and the items on which no allowance
is made." This is no more than the terms used would naturally
require. "The *benefits and advantages* to the respective own-
ers or proprietors," were to be *estimated and appraised* in the
same manner. This is also omitted. 2. They, the appraisers,
do not state that either the *benefits and advantages*, or the
*losses*, are "by and in consequence of making and constructing
the canal." 3. They did not make "regular entries of their de-
termination and appraisal," "*in a book or books to be provided
and kept by the canal commissioners.*" 4. They made no "*apt
and sufficient description* of the premises so appropriated, in a
book or books.to be provided and kept by the canal commission-
ers." In the performance of the duty of making "*an apt and suf-*

*ficient description of the premises,*" they do it by adoption of the language contained in the claim, to wit: " To land, ———— acres, at $100 per acre." This is the only *apt and sufficient* description made by the appraisers. How much land (will this court determine) did the claimant lose title to, by this description? 5. They had no book in which they made an entry of *this apt and sufficient description, and estimate and appraisal.* 6. They did not certify and sign their names to such entries and appraisal. 7. They did not pay the damages. The *title* to the lands in question, therefore, never passed to the state. They were bound to perform, positively, all the matters above enumerated, as conditions precedent to obtaining the title, any title, of other or of any character. (1 *Wend.* 474. 2 *Hill,* 342. 5 *Id.* 347.) Where property is taken under a statute authority, without the consent of the owner, the power must be strictly followed, and if any material link is wanting, the whole proceeding will be void. (*Doughty* v. *Hope,* 3 *Denio,* 595. 4 *Hill,* 86–92. 7 *Id.* 25.) (3.) If the appraisal was in due form, as required by the statute, the title of the premises in question did not pass to the state. By art. 5 of Amendments to the Constitution of the U. S. it is provided that "private property shall not be taken for public use without *just compensation.*" The same provision, in the same language, is contained in the constitution of the state of N. Y. of 1821. (*Art.* 7, § 7.) The "*just compensation*" to the owner, for taking his private property for public uses without his consent, has repeatedly received judicial construction, and means "*the actual value of the property in money, without any deduction for estimated profit or advantages accruing to the owner from the public use of his property.* Speculative advantages or disadvantages, independent of the intrinsic value of the property, from the improvements, are a matter of set-off against each other, and do not affect the dry claim for the intrinsic value of the property taken." (*Jacob* v. *The City of Louisville,* 9 *Dana,* 114. 2 *Kent's Com.* 6*th* ed. 339, *and note.*) No speculative value, contingent and not actual, can satisfy the words "*just compensation*" in the constitution. (*Id.*)

IV. If the justice based his decision upon the ground that the title was in the defendant he erred.

V. If the state ever had the title to the premises, such title reverted to the heirs of Eleazer Rexford, (who are the plaintiffs,) when the object for which they were taken had ceased.

These lands are now useless, and have become abandoned by the state. Whenever lands are taken for public use and when, for such purpose, the title vests absolutely, yet whenever that purpose is abandoned, the title reverts to the original owner. (*Hooker* v. *The Utica and Minden Turnpike Co.* 12 *Wend.* 371, 373.) And though the estate is declared by statute in one case to be a fee and in *a*nother case to be "the property of the state," yet it must in the former case be understood to be a conditional fee, and to cease when the purpose for which only it could have been acquired, ceases, and in the other case can only be deemed to have been acquired for the purposes for which it has been used. But as the lands in this case were taken under the statute of 1819, in which the character or tenure of the property taken is not declared by statute, there can be no difficulty in assuming that it now belongs to the original proprietor, certainly not after the abandonment of its use. After taking or getting possession of private property, under one power, a subsequent statute by the state, confirming or increasing its own title, would be void, no new consideration passing to the owner.

VI. If the justice based his decision upon the ground that the land reverted to the defendant as the grantee of plaintiffs' ancestor, such decision was erroneous. If the proposition that the state has the unconditional fee simple of the lands by virtue of an appraisal, be true, then it reverts to nobody. (*Sess. Laws,* 1817, *p.* 302, § 3. 1 *R. S. 3d ed.* 255, § 66, (52.) *Sec.* 10, *art. 7 of the Const. of* 1821.) If the proposition be true, that the premises became *the property of the state* by reason of no claim having been interposed by the owner, then the title reverts to the original proprietor. (1 *R. S. 3d ed.* 255, §§ 62, (48,) 63, (49 ;) *see sec.* 6, *art.7 of the Const. of* 1846 ; *sec.* 10, *art 7 of the Const. of* 1821.) We have a legislative prece-

Rexford v. Knight.

dent, which amounts to legislative construction of the question whether the title to the abandoned canal reverts to the adjoining owners. (*Sess. Laws* 1847, *chap.* 413, *p.* 512.) If the title to the premises in question never passed from the ancestor of the plaintiffs to the state, then they did not revert to the defendant. The principle laid down in *Jackson* v. *Hathaway*, (15 *John.* 454,) it is submitted, would determine this case against the defendant, even if the rights of reversion in relation to a canal, were like those of a public highway. But it is insisted that the reversion of an abandoned canal differs in principle from that of a public highway. In the former case, by the terms of the statute, the title passes absolutely to the state. In the latter, it is a mere easement to the public, the title remaining in the original proprietor. At the date of the Curtis deed, 26th September, 1825, (under which the defendant holds,) the state (if they ever had title) had the absolute title, and the plaintiffs' ancestor could not have conveyed it. The canal was not therefore an easement over the defendant's property, subject to a reversion to him.

*J. K. Porter*, for the defendant. I. The plaintiff failed to show that the title of the state had been divested. (1.) The state was shown to have acquired title. No resolution of the commissioners was necessary. "Entering upon the land and laying out and commencing the work amounted to a sufficient appropriation." (2 *Hill*, 342, 347. 6 *Id.* 359.) The transcripts from the state map were presumptive evidence of an appropriation by the state, and especially when coupled with proof of actual location and occupancy. (1 *R. S.* 218, §§ 7, 8.) (2.) The fact that no money was paid to Rexford for damages does not impair the title of the public. *The state has discharged its duty as to compensation*, when it has provided for the adjudication upon the claim, by a tribunal invested with the requisite powers. (6 *Hill*, 359, 361.) The adjudication by the appraisers that the " premises will suffer no damages, or will be benefited more than injured," passes " the fee simple of the premises so appropriated" in the same manner as when damages are awarded

and paid in money. (*Laws of* 1817, *p.* 303, *ch.* 262, § 3.) So under the revised statutes, the duty of payment arises only when the appraisers adjudge the damages to exceed the benefits. (1 *R. S.* 226, § 53.) (3.) The right to damages was waived, and the premises became "*the property of the state,*" even if it had not been so before, by the omission to exhibit the alleged claim to the appraisers after the adoption of the revised statutes, and within one year from the time when they took effect. (1 *R. S.* 226, § 49.) (4.) The state takes not a mere *easement,* but the title to the land in fee. Such is the plain import of the various statutes. "The fee simple of the premises so appropriated shall be vested in the people of this state." (*Laws of* 1817, 303, § 3.) "The premises so appropriated shall be deemed the property of the state." (1 *R. S.* 226, § 49. *Id.* 218, § 4.) The old and the new constitution both recognize the absolute title of the state, by prohibiting legislative alienation. "And the legislature shall never *sell or dispose of* the salt springs, &c. nor the said navigable communications, *or any part or section thereof;* but the same shall be and remain the property of this state." (*Const. of* 1821, *art.* 7, *sec.* 10; 1 *R. S.* 3*d ed.* 46. *See also Const. of* 1846, *art.* 7, *sec.* 6; 3 *R. S.* 3*d ed.* 422.) The courts have regarded the title in the same way. "The *absolute* fee did not pass to the state until the *appraisement* of damages," &c. (2 *Hill,* 347.) "The state takes a fee, *not a mere usufructuary interest.*" (2 *Hill,* 348.) Chief Justice Nelson holds, in the case of *The People* v. *Hayden,* (6 *Hill,* 361, 2,) that though the work should never be completed, and the benefits deducted by the appraisers are thus lost, it is a wrong without a remedy—not a wrong remedied by the reversion of the land. (5.) The fee being in the state unconditionally, it is clear at all events that nothing short of a state grant can divest it. So held, when land was originally taken by a turnpike company, became vested in the company by the act of 1804, and subsequently in the state by the act of 1820. (2 *Paige,* 184.) Such has been the practical construction of the legislature, though it is a grave question whether in giving legislative grants they have not exceeded

their power. (*Laws of* 1847, *p.* 512. *Laws of* 1850, *pp.* 395, 575. *Laws of* 1851, *p.* 427.)

II. But even assuming that the title of the state is not a fee simple in the legal sense of that term, and that the estate could be divested without a legislative grant; still it was at most a question of fact for the jury, whether the evidence established *an absolute abandonment* of the premises by the state, and the plaintiff did not ask to go to the jury on that question. (1.) The plaintiff should have requested the court to submit that question to the jury. (6 *Hill*, 407, 410.) (2.) All the evidence was reconcilable with the continuance of the claim and dominion of the state. The west blue line, instead of being abandoned was adhered to when the canal was enlarged. The mere fact that land is not included bodily within the canal *as actually constructed*, is not controlling on the question whether it is a part of the canal property of the state. It is usual for the state to take *adjacent* lands, and not unusual to allow others to occupy the state lands, when such occupancy does not prejudice the public for the time being. The bank of the enlarged canal actually ran into the bed of the old canal. Neither the canal board nor any state officer had ever declared it abandoned, or done any act indicating such an intent.

III. If the state title had ceased, the premises reverted to the grantees, and not to the heirs. (1.) The two lots conveyed by the deed to Curtis were on the two sides of the canal, embracing the premises in question; the first "bounded on the south by the river, and on the other sides *by the canal ;*" the other being Knight's lot, and described as "one hundred feet front *on the canal* by eighty feet in the rear." (2.) When a canal is named as a boundary, it is the same as if a ditch or a highway were designated. (4 *Hill*, 373. 24 *Wend.* 68. 6 *Conn.* 471, 474, 2 *Hill. on Real Prop.* 39, *note.* 6 *Cowen*, 518.) (3.) "When a farm is bounded *along* a highway, or *upon* a highway, or as *running to* a highway, there is reason to intend that the parties meant the middle of the highway." (4 *Hill*, 373. 15 *John.* 454.) So when the land was described as "lying *adjacent* and *extending to* the Oswego river." (9 *Paige*, 547, 550, 2, 7.)

So also when described as *on the side of a street*, held that the grant carried to the middle. (1 *Sandf. S. C. Rep.* 323, 340, 1.) (4.) The grant runs to the center, even where *the given measurement* is satisfied by running *to the edge*. (1 *Sandf.* 349. 8 *Wend.* 183. 4 *Paige*, 209, 212. 9 *Id.* 169. 3 *Barb.* 357, 8.) (5.) In order to *exclude* the stream, canal or highway, the terms of exclusion must be *clear, express*, and *of a very decided and controlling character.* (24 *Wend.* 451, 453. 5 *Id.* 443, 4. 1 *Sandf.* 344, 348, 9.) (6.) If it be left *in doubt* from the description whether the intent was to exclude the highway or boundary, the grantee takes to the middle. (20 *Wend.* 156. 8 *John.* 394.) (7.) If there is any remaining estate in the original owner, it passed by the warranty deed to Curtis. (15 *John.* 491. 2 *Hilliard*, 40. 1 *Sandf.* 323.) (8.) At most, all that the plaintiff could insist upon was that the intention of the instrument was a question of fact, to be determined on its language in connection with the surrounding circumstances, and no request was made to submit that question to the jury. (1 *Eng. Law and Eq. Rep.* 236, 239. 61 *Eng. Com. Law*, 641.)

IV. The bill of exceptions shows no *specific grounds* or *claims* on the part of the plaintiff, on which the court should have decided that the title of the state had been divested, or that if divested, it did not pass to the grantees of Eleazer Rexford. (2 *Hill*, 603. 6 *Barb. Rep.* 335, 581, 2. 1 *Hill*, 532, 536, 7. 1 *Comst.* 91, 2, 4.)

*By the Court*, WILLARD, P. J. The testimony shows that the premises sought to be recovered, were taken and appropriated prior to 1822, for the Erie canal. A claim for damages was made by the former owner of the land, which was acted upon by the appraisers, and they decided that the benefits and advantages arising from the canal were equal to the loss and damage sustained by the claimant. This award was probably made prior to 1825. This adjudication had the same effect in passing the title to the state, as the award of damages followed up by the payment thereof to the claimant. (*Laws of* 1817, *p.* 303,

Rexford v. Knight.

ch. 262, § 3; 1 R. S. 226, §§ 50, 53.) If the benefits equal or exceed the damages, the claim is extinguished the moment it is created.

It is contended by the plaintiffs that nothing short of a payment in money will pass the title, under our statutes. The case in Kentucky is the only one which supports this doctrine. It has been invariably held otherwise in this state, except in a single instance, viz. *The Psople* v. *Mayor of Brooklyn.* (6 *Barb.* 209,) which was overruled by the unanimous opinion of the court of appeals, in *The People* v. *Mayor of Brooklyn.* (4 *Comst.* 419.) The learned and elaborate opinion of Judge Ruggles in that case, places the constitutionality of setting off benefits against damages upon an impregnable basis.

The map of the canals, made under the direction of the canal commissioners, in pursuance of the statute, (1 R. S. 218, §§ 4, *et seq.*) affords presumptive evidence of the actual appropriation of the premises therein described, by the state, for the purposes of the canal. A transcript from the original map, or from a copy certified as correct, by the officer with whom such map or copy shall be filed, is made presumptive evidence in all judicial proceedings. (*Id.* § 7.) The objection was not taken to the *form of authentication* in this case, but merely " *to its being evidence of the title or possession of the state.*" This question was reserved by the learned judge. The omission of the proper certificate was not insisted on ; and if it had been, could have been obviated. The omission should be disregarded now. The map affords evidence of the appropriation of the premises in question to the purposes of the canal. The object of causing the canals to be surveyed and their boundaries marked on a map was to furnish evidence of the exact quantity of lands, by metes and bounds, appropriated for that purpose. The map alone does not vest the title in the state. It merely describes what the state has taken. It was therefore properly received in evidence. (*Laws of* 1837, *p.* 281, § 6. 1 R. S. 581.) And like a record it afforded evidence that all the antecedent steps had been taken by the canal commissioners.

There was sufficient evidence in the case, of an estimate and appraisment of the damages. The statute which required the appraisers to make regular entries of their determination and

appraisal, with an apt and sufficient description of the several premises appropriated for the canals, in a book or books to be provided and kept by the canal commissioners, and to certify and sign their names to such entries and appraisal, and in like manner to certify their determination as to those several premises which will suffer no damages or will be benefited more than injured by or in consequence of the works aforesaid, is merely directory. (*Laws of* 1817, *p.* 303, § 3.   1 *R. S.* 226.) The omission of the canal commissioners to keep such books, or of the appraisers to make such entries, does not impair the title of the state, however much it may weaken the evidence by which the title is proved. The title of the state rests on the appropriation of the land, under the statutes authorizing the construction of the canals, followed up by the appraisal and payment of the damages, or the adjudication by the proper board of appraisal that the benefits equal the damages.   The title which the state takes is not a mere *easement*, but an estate in fee.   This is expressly asserted in the act entitled " an act respecting navigable communication betweeen the great western and northern lakes and the Atlantic ocean," passed April 15, 1817.   (*Laws of* 1817, *p.* 303, § 3.)   It says, " the *fee simple* of the premises so appropriated, shall be vested in the people of this state."   This was the first efficient statute under which our great system of internal improvements was commenced.   It authorized the commencement of the canals between the Mohawk and Seneca rivers, and Lake Champlain and the Hudson. The act of April, 1819, (*Laws of* 1819, *p.* 123,) directed the continuation of the same canals from the Seneca river to Lake Erie, and from the point on the Mohawk where the middle section of the canal terminated, to the Hudson river, and it adoped all the provisions of the 3d section of the act of 1817, as to the powers of the canal commissioners to enter upon and take possession of the lands, waters, &c. the mode of estimating and appraising damages and the payment of damages, &c.   Statutes in *pari materia* must be construed with reference to each other.   This statute was not only upon the same subject matter, but related to the same identical work, which was to be contin-

Rexford *v.* Knight.

ued and completed by the same officers under which the central part of it was commenced. There can be no doubt that the state became seised of the same estate in the lands taken under the act of 1819, as in those appropriated by the act of 1817. Such has been the general understanding of the law. The revised statutes (1 *R. S.* 226, § 49,) in ch. 9, part 1, title 9, which was passed in December, 1827, speaking of the premises that shall have been appropriated to the use of a canal, at any time before that chapter should be in force, after limiting the presentation of claims for damages to one year from the time that chapter should become a law, says, "the premises so appropriated shall be deemed the property of the state;" and in the 52d section of the same aticle it is expressly enacted that the fee simple of all premises so appropriated shall be vested in the people of this state. The constitution of 1821, art. 7, § 10, after forbidding the legislature from selling the canals, or any part or section thereof, declares that the same shall be and remain the property of the state. And the constitution of 1846, art. 7, § 6, affirms the same doctrine more strongly, thus : " The legislature shall not sell, lease or otherwise dispose of the canals of the state, but they shall remain the property of the state, and under its management forever."

The construction of the courts has been that the state takes the fee simple in the lands appropriated for the canal, and that the fee vests on payment of the damages. (*Baker* v. *Johnson,* 2 *Hill,* 342, 348. *The People* v. *Hayden,* 6 *Id.* 359.)

If the state has the fee simple of the land in question, the plaintiff was rightly nonsuited, and it is unnecessary to discuss or consider the other questions. It is only on the principle that the state took merely an easement, that the plaintiff has any pretense for asserting that the right of the state has ceased.

Being of the opinion that the title is still in the state in fee, the motion for a new trial must be denied.

[WARREN GENERAL TERM, May 3, 1852. *Willard, Hand, Cady* and *C. L. Allen,* Justices.]